John Wiegand, IL Bar No. 6191132
Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco, CA 94103
Telephone: (415) 848-5174
*jwiegand@ftc.gov*

Nicolas Stebinger, NY Bar No. 4941464
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: (202) 326-2688
*nstebinger@ftc.gov*

Malinda Lee, CA Bar No. 263806
Roma Patel, CA Bar No. 318175
California Department of Justice
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6223
*Malinda.Lee@doj.ca.gov*
*Roma.Patel@doj.ca.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br><br>and<br><br>**STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**JOHN MUIR HEALTH**<br><br>and<br><br>**TENET HEALTHCARE CORPORATION,**<br><br>Defendants. | Case No. 5:23-cv-05952-PCP<br><br>**COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT**<br><br>**UNREDACTED VERSION PURSUANT TO ORDER OF COURT** |

Plaintiffs Federal Trade Commission ("FTC" or "Commission") and the State of California petition this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendants John Muir Health ("John Muir") and Tenet

Healthcare Corporation ("Tenet"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships and joint ventures, from consummating their proposed transaction under which John Muir would become the sole owner of San Ramon Regional Medical Center, LLC (the "Proposed Acquisition"). The Proposed Acquisition threatens to eliminate substantial competition between the San Ramon Regional Medical Center and John Muir's nearby hospitals, raise prices for insurers and their enrollees, and significantly increase concentration in an already highly concentrated market. Defendants have represented that unless the Court grants the relief Plaintiffs seek, Defendants will consummate the Proposed Acquisition as soon as possible after 11:59 p.m. on November 22, 2023. Plaintiffs seek this provisional relief under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26.

Plaintiffs require the aid of this Court to maintain the status quo and prevent interim harm to competition during the pendency of an administrative proceeding on the merits. The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on November 17, 2023. The administrative hearing on the merits will begin on April 17, 2024. That administrative hearing will determine the legality of the Proposed Acquisition and will provide all parties a full opportunity to conduct discovery, depose witnesses, and present testimony and other evidence on the likely competitive effects of the Proposed Acquisition.

## NATURE OF THE CASE

1.      John Muir, one of the largest and most expensive hospital systems in Northern California, seeks to acquire full control of the San Ramon Regional Medical Center ("SRRMC"). If allowed to proceed, the Proposed Acquisition threatens to substantially lessen competition for critical healthcare services along the I-680 corridor, which spans portions of California's Contra Costa and Alameda Counties.

2.      Today, John Muir is the largest provider of inpatient general acute care ("GAC") hospital services along the I-680 corridor. John Muir provides inpatient GAC services through its

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
CASE NO. 5:23-cv-05952-PCP

two hospitals: the Walnut Creek and Concord Medical Centers. The John Muir hospitals are known for charging high prices. For example, a 2020 New York Times article stated: "John Muir Health . . . [is] the most costly system in the nation. Private insurers pay its hospitals four times what Medicare reimburses for care." Multiple insurers who offer health plans to individuals along the I-680 corridor confirm that John Muir's hospitals are more expensive than other facilities in the area.

3.   John Muir can extract these high prices from insurers because competition in the area is so limited. Just a handful of hospitals other than John Muir's sit within the I-680 corridor; one of those hospitals is SRRMC. As a result, insurers need John Muir's hospitals in their health plan networks to market a successful product to consumers who live along the I-680 corridor.

4.   John Muir now seeks to enhance and expand its commanding position in the I-680 corridor by acquiring SRRMC, a nearby hospital operated by Tenet. Today, SRRMC is one of John Muir's few meaningful competitors. SRRMC sits just 14 miles south of John Muir's flagship hospital in Walnut Creek and provides high-quality care.

5.   If John Muir were permitted to acquire SRRMC, insurers would have fewer competing alternatives for inpatient GAC services in the I-680 corridor. As a result of this substantial lessening of competition, John Muir would be able to demand higher rates from insurers for the combined entity's services due to an increase in its bargaining leverage in rate negotiations with insurers. Higher rates are expected to lead to higher insurance premiums, co-pays, deductibles, and other out-of-pocket costs or reduced benefits for commercial health insurance enrollees.

6.   SRRMC also competes with John Muir for patients by improving its quality, service offerings, and facilities. These investments at SRRMC, and the competition that prompts them, provide a meaningful benefit to SRRMC's patients. The Proposed Acquisition will immediately eliminate this competition, reducing healthcare investment and improvement along the I-680 corridor.

7.   Finally, the Proposed Acquisition is presumptively illegal because it will significantly increase concentration in the already highly concentrated I-680 corridor market for

inpatient GAC services sold to commercial insurers and their enrollees. Post-acquisition, John Muir will control more than 50% of inpatient GAC services offered in the I-680 corridor as measured by hospital discharge data. These high market shares and concentration levels underscore the competition the Proposed Acquisition will eliminate and render the Proposed Acquisition presumptively unlawful under the relevant caselaw. An array of qualitative and quantitative evidence confirms this strong presumption of illegality.

8.      The parties have stipulated to entry of a temporary restraining order to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction. Under this temporary restraining order, Defendants cannot consummate the Proposed Acquisition until the fifth business day after the Court rules on the Commission's request for a preliminary injunction or until after the date set by the Court, whichever is later.

9.      Preliminary injunctive relief is similarly necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing the Proposed Acquisition to proceed while the Commission is assessing the Proposed Acquisition's potential anticompetitive effects would undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is found unlawful after a full trial on the merits and any subsequent appeals and would harm the public's interest in effective enforcement of the antitrust laws.

## JURISDICTIONAL STATEMENT

### Jurisdiction

10.      The Court has jurisdiction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized to bring this suit.

11.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

12.    Defendants and their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants are, and at all relevant times have been, engaged in commerce in the State of California.

13.    In conjunction with the Commission, the State of California brings this action for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending the Commission's administrative trial. The State of California has standing to bring this action because the Proposed Acquisition would cause antitrust injury in California for inpatient GAC services sold to commercial insurers and their enrollees.

## Venue

14.    Defendants transact business in the Northern District of California. The FTC Act, 15 U.S.C. § 53(b), also authorizes nationwide service of process. Defendants are therefore subject to personal jurisdiction in the Northern District of California. Fed. R. Civ. P. 4(k)(1)(C). Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

## Divisional Assignment

15.    Assignment to the San Francisco Division is proper. This action arises in Contra Costa County because a substantial part of the events giving rise to these claims occurred in Contra Costa County, where Defendant John Muir is headquartered.

**THE PARTIES**

16.    Plaintiff Federal Trade Commission is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

17.    Plaintiff State of California is a sovereign state of the United States. This action is brought by and through its Attorney General in his sovereign capacity and as parens patriae on behalf of his citizens, general welfare, and economy pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

18.    Defendant Tenet Healthcare Corporation is a public company incorporated in Nevada with its headquarters in Dallas, Texas. Tenet operates 61 general acute care hospitals and hundreds of outpatient facilities nationally, including numerous facilities in California. Tenet operates SRRMC, a 123-bed hospital located just off of I-680 in San Ramon, California and roughly 14 miles south of John Muir's Walnut Creek Medical Center. Before 2013, Tenet was the sole owner of SRRMC. In 2013, pursuant to a series of joint venture agreements, Tenet transferred a 49% non-controlling interest in San Ramon Regional Medical Center, LLC, the entity that owns SRRMC, to John Muir. Tenet currently holds a 51% controlling interest in San Ramon Regional Medical Center, LLC and continues to operate SRRMC. As operator of SRRMC, Tenet is solely responsible for setting list prices and negotiating contract rates with insurers for SRRMC.

19.    Defendant John Muir Health is a California non-profit corporation headquartered in Walnut Creek, California. John Muir operates two hospitals that provide inpatient GAC services along the I-680 corridor. John Muir's Walnut Creek Medical Center, a 554-bed facility, is the area's largest hospital. John Muir's Concord Medical Center is a 244-bed facility located less than 10 miles from its Walnut Creek Medical Center. John Muir also manages physician practices of approximately 300 physicians and negotiates contracts on behalf of approximately 700 additional physicians through the John Muir Health Physician Network. John Muir further operates an array of outpatient facilities including urgent care clinics, imaging centers, and an

outpatient surgery center. John Muir holds a 49% non-controlling interest in San Ramon Regional Medical Center, LLC, the entity that owns SRRMC.

### THE PROPOSED ACQUISITION

20.     On January 10, 2023, John Muir and Tenet entered into an Equity Interest Purchase Agreement ("Purchase Agreement") whereby John Muir agreed to acquire Tenet's controlling interest in San Ramon Regional Medical Center, LLC, together with other assorted assets, for approximately $142.5 million.

21.     Under the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a timing agreement between Defendants and Commission staff, unless this Court temporarily restrains and preliminarily enjoins Defendants, they would be free to consummate the Proposed Acquisition after 11:59 p.m. on November 22, 2023.

### COMPETITION BETWEEN HOSPITALS BENEFITS PATIENTS

22.     Hospital competition to provide inpatient GAC services for commercially insured patients occurs in two distinct but related stages. In the first stage of hospital competition, hospitals compete to be included in insurers' health plans. To become an "in-network" provider, a hospital negotiates with an insurer and enters a contract if it can agree with the insurer on terms. The hospital's reimbursement rates for services rendered to a health plan's enrollees are a central component of those negotiations.

23.     Insurers attempt to contract with local hospitals (and other healthcare providers) that offer services that current or prospective members of the health plan want. In-network hospitals are typically much cheaper for health-plan enrollees to seek care from than an out-of-network hospital. Unsurprisingly, a hospital will attract more of a health plan's enrollees when it is in-network. Hospitals therefore have an incentive to offer competitive terms and reimbursement rates to induce the insurer to include the hospital in its health-plan network.

24.     From the insurer's perspective, having hospitals in-network enables the insurer to assemble a health-plan provider network in a particular geographic area that is attractive to current and prospective enrollees, typically local employers and their employees.

25.     A hospital has significant bargaining leverage with insurers if its absence would make an insurer's health-plan network substantially less attractive (and therefore less marketable) to its current and prospective enrollees. This relative attractiveness to the insurer depends largely on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of the plan's enrollees. The presence of alternative, conveniently located, high-quality competitors thus limits the bargaining leverage of a hospital in negotiations with the insurer. Where there are fewer meaningful alternatives, and therefore less competition, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other advantageous contract terms.

26.     A merger involving hospitals that insurers and their enrollees consider substitutes increases the combined hospitals' bargaining leverage because it eliminates a previously available alternative for the insurers and enrollees. Such a merger may substantially lessen competition by increasing the merged entity's incentive and ability to raise prices or reduce quality, because the merger eliminates an available alternative that an insurer could otherwise offer (or threaten to offer) its health-plan members in response to increased prices or a reduction in service.

27.     Increases in hospital reimbursement rates have a significantly negative impact on insurers' health plan enrollees, such as through higher cost-sharing payments or fewer benefits. For fully insured employers, increased healthcare costs would come in the form of higher premiums. Self-insured employers would fully bear those increased healthcare costs because they pay for claims directly. Individual patients also could feel the burden of increased costs in the form of higher insurance premiums, co-pays, deductibles, or other out-of-pocket costs.

28.     In the second stage of competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services. Patients often face similar out-of-pocket costs to access in-network providers. As a result, in-network hospitals often compete on non-price features, such as location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, conveniences, and patient satisfaction. This competition benefits all patients, regardless of whether those patients are covered by

commercial insurance, Medicare, Medi-Cal, or no insurance at all. A merger of competing

hospitals eliminates this form of non-price competition between the hospitals.

## THE PROPOSED ACQUISITION WILL ELIMINATE DIRECT
## COMPETITION BETWEEN JOHN MUIR AND SRRMC

29.    Today, competition drives SRRMC to charge lower rates to many commercial

insurers for inpatient GAC services than John Muir charges for its hospitals.

30.    John Muir can charge higher rates to insurers for inpatient GAC services than

SRRMC because of John Muir's size and significance in the I-680 corridor. Travel in and out of

the I-680 corridor is slow and burdensome. Patients in the area prefer to receive health care close

to their homes. John Muir's hospitals are large, conveniently located facilities in the I-680

corridor. John Muir also faces limited competitive pressure from the handful of other hospitals in

the I-680 corridor. As a result, most insurers view John Muir's hospitals as vital to successfully

marketing health plans to consumers who live in the I-680 corridor and satisfying California's

health insurance network adequacy requirements. Insurers' views regarding the importance of

John Muir's hospitals provide John Muir with significant leverage when negotiating rates with

insurers. John Muir's high rates demonstrate this leverage in action.

31.    In contrast, SRRMC is a smaller hospital within the I-680 corridor that lacks the

leverage over insurers to demand the rates that John Muir charges. This dynamic drives SRRMC

to compete and provide a meaningful alternative for insurers seeking to market health plans in

the I-680 corridor.

32.     The following map illustrates where John Muir's Walnut Creek and Concord Medical Centers and SRRMC sit along highway I-680:



33.     Defendants know that inpatient GAC services at John Muir's facilities are significantly more expensive than at SRRMC. A financial performance improvement document commissioned by John Muir, shared among John Muir's most senior executives, and relied on in John Muir's strategic planning, used the "% of Medicare Rates" equivalency metric to illustrate relative rates charged by John Muir's hospitals and by other hospitals in Northern California, including SRRMC. That document reflects that John Muir charges rates to commercial insurers that are significantly higher than rates at SRRMC:

**Commercial Price Landscape**

JMH's prices are higher than many other hospitals in the Bay Area (RAND study)

Relative Price[1] for IP and OP Services as a % of Medicare Rates, 2016-2018
JMH | Sutter | Dignity | Stanford | NorthBay | USCF | SF General

| Hospital | Relative Price | | |
|---|---|---|---|
| Concord Medical Center | 382% | | |
| Walnut Creek Medical Center | 409% | | |
| San Ramon Regional Medical Center | 213% | JMH | System-Level Relative Price National Ranking[2] **1** (highest relative prices paid in the nation) |

34.     By eliminating SRRMC as a competitive alternative to John Muir's hospitals, the Proposed Acquisition will exacerbate John Muir's already significant leverage over insurers that allows it to demand some of the highest rates in the country. The most pronounced price increase resulting from the elimination of this competition can be expected at SRRMC. Today, SRRMC may lack the ability to negotiate higher rates with insurers, but if the Proposed Acquisition is allowed to close, John Muir will be able to leverage its control of an even greater proportion of the I-680 corridor's hospitals when negotiating for rates at SRRMC.

35.     Tenet recognized this possibility when valuing SRRMC in connection with the Proposed Acquisition. In particular, Tenet modeled that John Muir could significantly increase SRRMC's revenues simply by raising rates at the hospital:

**Additional Considerations**

• Based on a managed care analysis performed in 2019 the 75th percentile for managed care rates in the San Ramon market was 375% of Medicare, compared to SRRMC which was 255% of Medicare. Based on this analysis, if the Hospital's managed care rates were at the 75th percentile of the market, EBITDA would increase by approximately $50mm

36.     Econometric evidence confirms that after the Proposed Acquisition, John Muir will have the incentive and ability to raise prices at SRRMC.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
CASE NO. 5:23-cv-05952-PCP

37.     In addition to causing higher prices, the Proposed Acquisition will immediately eliminate competition between SRRMC and John Muir that has spurred investment to improve the quality of inpatient GAC services in the I-680 corridor.

38.     Currently, SRRMC competes directly with John Muir by improving the quality and variety of its services to attract patients away from John Muir's hospitals.

39.     For example, in 2022, SRRMC management requested approval to acquire a CelTivity system, a device used to image cancer-related biopsied tissue. The CelTivity system facilitates quicker treatment decisions by pathologists and surgeons. Competition with John Muir was a key factor that motivated SRRMC's management to seek the CelTivity system: "John Muir has this device and it allows the surgeons there to make a faster decision about performing surgery or not, which causes surgeons to prefer to perform their surgeries there vs. at SRRMC. We believe that offering this technology here will make us competitive and allow our program to grow. . . . Without CelTivity we will . . . not be able to compete with John Muir fully on the technical capabilities that make decision-making easy for the physicians." In 2023, SRRMC acquired the CelTivity system, enabling its physicians to diagnose certain cancers earlier and more accurately, directly benefiting SRRMC's patients.

40.     Similarly, in 2019, SRRMC staff requested and received approval for tools used in minimally invasive heart surgery. To justify this capital expenditure, SRRMC's CEO wrote: "The cardiovascular surgeons on medical staff at San Ramon Regional Medical Center are the only heart surgeons along the I-680 corridor and they perform heart surgeries at John Muir Medical Center, Valley Care Medical Center and San Ramon Regional Medical Center. . . . With key competitors [John Muir Medical Center and Valley Care Medical Center] only about a 15-minute drive to both our north and south, we believe this investment in minimally invasive tools for cardiac surgery will help us continue to compete in our market for growth, reputation and quality of care in cardiac care."

41.     SRRMC's internal documents include additional examples of SRRMC competing closely with John Muir by recommending improvement to services and facilities to attract

patients that otherwise would seek treatment at John Muir's hospitals. This competition has led to concrete improvements in quality of care at SRRMC that have directly benefited its patients.

42.     The Proposed Acquisition will immediately eliminate this valuable and substantial competition. Once it acquires SRRMC, John Muir will have less incentive to invest in further improving services at SRRMC to compete with services offered at John Muir's other facilities.

43.     Because the Proposed Acquisition will eliminate substantial competition between SRRMC and John Muir for inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor, the Proposed Acquisition is unlawful.

## THE PROPOSED ACQUISITION WILL SIGNIFICANTLY INCREASE CONCENTRATION IN A HIGHLY CONCENTRATED MARKET

44.     In addition to evidence of direct competition between SRRMC and John Muir's hospitals that the Proposed Acquisition will eliminate immediately, quantitative evidence reflects that the Proposed Acquisition will significantly increase concentration in the already highly concentrated market for inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor, and therefore is presumptively unlawful.

### The Relevant Service Market: Inpatient GAC Services Sold to Commercial Insurers and Their Enrollees

45.     Inpatient GAC services sold to commercial insurers and their enrollees is a relevant service market in which to assess the Proposed Acquisition's effect on competition.

46.     Inpatient GAC services are medical, surgical, and diagnostic services requiring an overnight hospital stay. Inpatient GAC services comprise a broad cluster of hospital services for which competitive conditions are substantially similar. Examples of inpatient GAC services include complex surgeries such as neural or cardiac surgery, childbirth, treatment of serious illnesses and infections, and some emergency care. Inpatient GAC services are required by distinct customers: individuals who need medical, surgical, and diagnostic services that necessitate an overnight hospital stay. Inpatient GAC services are provided by specialized providers: acute care hospitals. Due to the specialized facilities, regulatory and licensing

requirements, and high level of care involved, inpatient GAC services have prices that are distinct from and relatively insensitive to price changes for other medical services, such as outpatient services. Industry participants, including Defendants, recognize inpatient GAC services as a distinct category of services in the ordinary course of their business.

47.     Here, inpatient GAC services include all overlapping inpatient GAC services that both John Muir and SRRMC sell to commercial insurers and provide to their enrollees.

48.     Although the Proposed Acquisition could be analyzed separately for each of the many individual inpatient GAC services Defendants offer, it is appropriate to assess competitive effects and calculate market concentration for inpatient GAC services as a cluster of services because these services are offered under substantially similar competitive conditions. Grouping the hundreds of individual inpatient GAC services into a cluster for analytical convenience enables the efficient evaluation of the likelihood of a substantial lessening of competition without forfeiting the accuracy of the overall analysis and reflects commercial and competitive realities.

49.     Outpatient services (i.e., services that do not require an overnight hospital stay such as routine physical exams, bloodwork, and mammograms) are not included in inpatient GAC services markets because insurers and their enrollees cannot substitute outpatient services for inpatient services in response to a price increase on inpatient GAC services. Additionally, outpatient services often are offered by a different set of providers under different competitive conditions.

50.     The relevant service market does not include other services that are neither substitutes for nor offered under similar competitive conditions as inpatient GAC services. For example, the relevant service market does not include services related to behavioral health, psychiatric care, substance abuse, and rehabilitation services.

51.     The hypothetical monopolist test is another quantitative tool used by courts and government agencies to assist in determining the relevant markets in antitrust cases. The test asks whether a hypothetical monopolist of a proposed market likely would impose at least a small but significant and non-transitory increase in price. In practical terms, this requires an examination

of whether a hypothetical monopolist of the proposed market *could profitably* impose a small but significant and non-transitory increase in price.

52.   Here, a hypothetical monopolist of inpatient GAC services sold to commercial insurers and their enrollees could profitably impose a small but significant and non-transitory increase in price of those services. Inpatient GAC services sold to commercial insurers and their enrollees therefore satisfies the hypothetical monopolist test.

**The Relevant Geographic Market: The I-680 Corridor**

53.   An appropriate relevant geographic market in which to analyze the effects of the Proposed Acquisition is no broader than the I-680 corridor in California's Contra Costa and Alameda Counties. The I-680 corridor is the main area where SRRMC and John Muir's Walnut Creek and Concord Medical Centers compete.

54.   The I-680 corridor is bounded by geographical features that make travel out of the area cumbersome and unpredictable in terms of transit time. The I-680 corridor runs parallel to the I-680 highway approximately from Pleasanton, California in the south to Pacheco, California in the north. A body of water, the Carquinez Strait, restricts travel at the north of the I-680 corridor. The I-680 corridor is bounded to the west by the East Bay Hills, which separate the area from the Oakland and Berkeley population centers. A limited number of congested tunnels, passes, and circuitous routes are the only options for motorists seeking to cross these hills and natural areas to travel west from the I-680 corridor into Oakland or Berkeley. Mountains, hills, and natural areas of the Diablo Range restrict transit from the I-680 corridor to the east and south.

55.   Patients who receive inpatient GAC services along the I-680 corridor prefer to obtain inpatient GAC services close to where they live. Because a significant portion of patients within this geographic market would not view hospitals outside of the market as practical or desirable alternatives, commercial insurers view it as difficult, if not impossible, to successfully market a health plan to enrollees along the I-680 corridor that excludes all hospitals providing inpatient GAC services within the I-680 corridor.

56.    Commercial insurers also must meet California regulatory requirements that mandate a certain level of geographic access for enrollees of their health plans. Insurers could not meet access requirements for some patients in the I-680 corridor if those insurers did not include any I-680 corridor hospitals in their health plans.

57.    Quantitative evidence confirms this commercial reality. A hypothetical monopolist of inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor could profitably negotiate a small but significant and non-transitory increase in price. The I-680 corridor market satisfies the hypothetical monopolist test.

**The Proposed Acquisition Leads to a Presumptively Unlawful Increase in Concentration**

58.    The Proposed Acquisition will grow John Muir's already significant market share for inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor to greater than 50% and threaten undue concentration, and therefore is presumptively unlawful.

59.    This presumption is bolstered by the fact that the Proposed Acquisition represents one more step in an existing trend toward concentration in the market for inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor. John Muir itself has driven this trend: In 1996, John Muir acquired the formerly independent Mount Diablo Medical Center, now rebranded as the John Muir Concord Medical Center. After the Proposed Acquisition, John Muir will control three formerly independent hospitals that provide inpatient GAC services in the I-680 corridor.

60.    Further, market shares for the remaining I-680 corridor hospitals may understate the anticompetitive effect of the Proposed Acquisition. In particular, a vertically integrated healthcare company, Kaiser Permanente ("Kaiser"), operates a hospital in Walnut Creek that provides inpatient GAC services in the I-680 corridor. Kaiser generally does not make its hospitals or physicians available to enrollees of other commercial insurers' health plans. Rather, Kaiser enrolls individuals in its own health plans, and provides inpatient GAC services to those enrollees almost exclusively at Kaiser's own facilities.

61.    Switching between Kaiser and non-Kaiser health plans is a significant undertaking for an individual. The individual must not only enroll in a new health plan, but also

must switch to new healthcare providers, such as primary care physicians and specialists, which increases barriers to switching for the individual. In contrast, an individual switching among non-Kaiser health plans may be able to retain their healthcare providers under their new insurance.

62.     Some individuals prefer health care obtained through Kaiser's integrated model, while others prefer the flexibility of choosing among hospitals and healthcare providers available through health plans offered by non-integrated commercial health insurance companies.

63.     Because switching between Kaiser and non-Kaiser health plans is burdensome and involves significant non-price individual preference, and Kaiser does not compete directly with other hospitals in the I-680 corridor for contracts with commercial insurers, Kaiser's I-680 corridor hospital would serve as only an attenuated constraint on John Muir's ability to increase prices after the Proposed Acquisition. Kaiser's share of patient discharges for inpatient GAC services in the I-680 corridor thus overstates Kaiser's significance when evaluating the competitive effects of the Proposed Acquisition.

64.     Courts, federal and state agencies, and economists commonly employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. An acquisition is presumptively unlawful if it leads to (i) a post-acquisition HHI above 2,500 points and (ii) an HHI increase of more than 200 points.

65.     In the market for inpatient GAC services sold to commercial insurers and their enrollees in the I-680 corridor, the Proposed Acquisition will result in a HHI above 4000 points, with an increase greater than 500 points, leading to a presumption of illegality—even when Kaiser is accorded the full weight of its share of patient discharges. Were Kaiser excluded from the relevant market, the Proposed Acquisition would lead to a still greater degree of concentration.

66.     High barriers to entry and the lack of recent meaningful entry into the relevant market further bolster the presumption of illegality of the Proposed Acquisition.

1

## LACK OF COUNTERVAILING FACTORS

2
3
67.     New entry of providers of inpatient GAC services in the I-680 corridor will not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

4
5
6
68.     John Muir itself has estimated that to build a new hospital offering inpatient GAC services "would likely take at least seven years from start to finish," and would cost between $7 and $8 million per hospital bed.

7
8
9
10
69.     Construction of a new hospital includes high costs and significant financial risk, including the time and resources it would take to conduct studies, develop plans, acquire land or repurpose a facility, garner community support, obtain regulatory approvals, and build and open the facility.

11
12
13
14
70.     Expansion of existing hospitals and repositioning by non-hospital providers to become hospitals in the I-680 corridor would encounter similarly high barriers, including substantial expense and time associated with planning, receiving regulatory approvals, and construction.

15
16
17
71.     Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption and evidence of the Proposed Acquisition's likely anticompetitive effects.

18

## LIKELIHOOD OF SUCCESS ON THE MERITS,

19

## BALANCE OF EQUITIES, AND NEED FOR RELIEF

20
21
22
23
24
25
26
27
28
72.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the equities. The predominant equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interests are afforded little to no weight and cannot tip the scale against a preliminary injunction.

73.     The FTC is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act or Section 5 of the FTC Act, and that the Purchase Agreement and Proposed Acquisition constitute unfair methods of competition in violation of Section 5 of the FTC Act.

74.     Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative proceeding, that the Proposed Acquisition is unlawful, reestablishing the status quo would be difficult, if not impossible, if the Proposed Acquisition has already occurred in the absence of preliminary relief. Allowing the Proposed Acquisition to close before the completion of the administrative proceeding would cause irreparable harm by, among other things, enabling John Muir to begin altering SRRMC's operations and business plans, eliminating key SRRMC personnel, and altering SRRMC's contracts with insurers, physicians, and vendors. In the absence of relief from this Court, substantial harm to competition would occur in the interim, even if suitable divestiture remedies were obtained later.

75.     Accordingly, the equitable relief requested here is in the public interest. Plaintiffs respectfully request that the Court:

1. Enter the parties' stipulated temporary restraining order;

2. Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another or SRRMC, either directly or indirectly;

3. Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

4. Award such other and further relief as the Court may determine is appropriate, just, and proper.

1

2    Dated: November 17, 2023                    Respectfully submitted,

3                                                /s/ Nicolas Stebinger
     Of counsel:                                 NICOLAS STEBINGER
4                                                Senior Trial Counsel

5    HENRY LIU
     Director                                    JOHN WIEGAND
6    Bureau of Competition                       PETER COLWELL
                                                 MATTHEW DELGADO
7    RAHUL RAO                                   PETER HUSTON
     Deputy Director                             LUCY ROSENZWEIG
8    Bureau of Competition                       ERIKA WODINSKY
                                                 *Attorneys for Plaintiff Federal Trade*
9    SHAOUL SUSSMAN                              *Commission*
     Associate Director for Litigation
10   Bureau of Competition

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR PLAINTIFF STATE OF CALIFORNIA:

Dated: November 17, 2023

ROB BONTA
Attorney General
State of California

/s/ Malinda Lee
MALINDA LEE
Deputy Attorney General

RENUKA GEORGE
Senior Assistant Attorney General
EMILIO VARANINI
Supervising Deputy Attorney General
ROMA PATEL
RAYMOND WRIGHT
MELISSA HAMILL
MATHEW SIMKOVITS
Deputy Attorneys General
*Attorneys for Plaintiff State of California*

1

## **FILER'S ATTESTATION**

I, Nicolas Stebinger, am the ECF User whose ID and password are being used to file this Complaint for a Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act. In compliance with Civil Local Rule 5-1(i), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

By: /s/ Nicolas Stebinger
Nicolas Stebinger